**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KENNETH THOMPSON, SR., and )
KRT, a minor, )
                               )
       Plaintiffs, )
                               )      No. 23 C 13982
     v. )
                               )      Judge Sara L. Ellis
THE VILLAGE OF MONEE, an Illinois )
municipal corporation, MAYOR JAY )
FARQUHAR, MAYOR THERESA M. BOGS, )
CHIEF SCOTT KOERNER, WAYNE )
HASSER, ROMULUA BIRIS, MICHAEL )
KOS, OFFICER EVIE LAZZARONI, )
OFFICER JAMAL MARTIN, OFFICER )
MATTHEW LUDWIG, OFFICER DRUM, )
OFFICER BLAKE, ERWIN BOGS, )
ROBERTA BOGS, DAVID LYNCH, and )
JUDITH LYNCH, )
                               )
       Defendants. )

**OPINION AND ORDER**

Plaintiff Kenneth Thompson and his minor daughter, KRT, live in the Village of Monee

(the "Village"), where their neighbors and Village officials have allegedly subjected them to

harassment. In a sprawling, ninety-six-page first amended complaint, accompanied by fifty

pages of exhibits, Thompson, proceeding *pro se* on his own behalf and that of his minor

daughter, KRT, brings claims for violation of their equal protection, due process, and First

Amendment rights, federal and state conspiracy, intentional infliction of emotional distress

("IIED"), and harassment. He also seeks indemnification from the Village for any acts of its

employees. He names as Defendants Erwin Bogs ("Erwin"), Roberta Bogs ("Roberta"), David

Lynch ("David"), and Judith Lynch ("Judith," and, collectively with Erwin, Roberta, and David,

the "Neighbors"); the Village; and former Mayor Jay Farquhar, current Mayor Theresa Bogs

("Theresa"), Village Clerk Wayne Hasser, Code Enforcement Officers Romulus Biris and Michael Koss, Police Chief Scott Koerner, and Police Officers Evie Lazzaroni, Jamal Martin, Matthew Ludwig, Drum, and Blake (collectively, the "Village Individual Defendants"). All Defendants have filed motions to dismiss Thompson's first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Although the Court dismisses KRT's claims and significantly narrows Thompson's claims, Thompson may proceed with his equal protection, First Amendment retaliation, IIED, and conspiracy claims against certain of the Village Individual Defendants.

## BACKGROUND[1]

Thompson, an African American business owner, has lived at 6644 W. Maple Court in Monee, Illinois since 2005. His house is in the cul-de-sac in Gorman Farm Estates, which boasts large lots, and is approximately 5.3 miles from the Village Hall. One of Thompson's children, KRT, a minor, continues to live with him at his house, and he has custody of two minor grandchildren. Thompson also owned investment property in the Village, including at 6636 W. Maple Court.

Hasser and Theresa are married. Hasser served as the Village Clerk for over ten years, while Theresa currently serves as the Village Mayor. Erwin and Roberta, Theresa's parents and Hasser's in-laws, live directly across the street from Thompson. Erwin previously served as a member and chairperson of the Village Planning and Zoning Committee. David and Judith live next door to Erwin and Roberta.

Thompson's issues with his neighbors and the Village began soon after he moved into the Village. On August 15, 2007, Thompson's son Keenan hosted a trunk party to celebrate his

---

[1] The Court takes the facts in the background section from the first amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motions to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

enrollment at the University of Illinois Urbana Champaign. Village police harassed Keenan's friends, arresting two of them that night. On June 21, 2008, Officer Drum arrived at Thompson's house during his daughter's birthday party and threatened to make arrests after a neighbor called with a noise complaint. On May 11, 2009, Thompson called Village police to request assistance with a trespasser on his property. Officer Drum arrived and tried to arrest Thompson, but Thompson entered his house and locked the door. Thompson provided video of the incident to the Village police chief. On July 11, 2009, Thompson hosted a birthday party. The Neighbors made reports to the Village police, falsely alleging that Thompson's family and friends were riding ATVs on their property, playing loud music, and parking cars on neighbors' grass. The Neighbors also complained that Thompson was not cutting his grass and as such bringing down their property values. Officers Lazzaroni, Blake, Cresenti, Fowler, Cash, and Jones made several visits to Thompson's house that day in response.

In addition to these troubles, between 2007 and 2009, Thompson received numerous citations and tickets, sometimes for the same violation, without receiving copies or notice of the tickets. On August 6, 2009, Thompson received three code violation tickets for the same alleged incident, with each ticket carrying a fine of $1,952. Thompson only discovered these tickets through an online search; the Village never notified Thompson of these tickets or sent him a communication to allow him to contest them.

On July 10, 2010, Thompson hosted a business networking function. The Neighbors again called the Village police with false allegations about Thompson. Officers Lazzaroni, Blake, Cresenti, Fowler, Cash, and Jones arrived at Thompson's house several times that day and unsuccessfully tried to arrest Thompson. Officer Blake attempted to enter Thompson's house, but a residential security agent stopped him from doing so. The following year, on July 9, 2011,

Thompson again hosted a business networking function.  The Neighbors, as well as Theresa and Hasser, made false allegations about Thompson to the police that day.  Officers Lazzaroni, Blake, Cresenti, Fowler, Cash, Jones, and Drum visited Thompson's house several times that day and again unsuccessfully attempted to arrest Thompson.  The Neighbors also made similar false allegations on July 17, 2011, but nothing came of these allegations.

On June 25, 2012, Thompson filed a case in this District against the Village and other defendants. *Thompson v. Vill. of Monee*, No. 12 C 5020 (N.D. Ill.).  Defendants' actions toward Thompson died down during the pendency of the case.  But on September 8, 2014, Thompson filed a complaint with the Village police chief because Blake tried to run Thompson off the road. After the case's dismissal on June 17, 2015, Thompson experienced additional discrimination and harassment.  In June 2015, someone set fire to Thompson's son's car, which was parked in the grass on Thompson's investment property.  Thompson suspects the Lynches' son, Michael, set the fire.  In July 2015, Thompson called 911 because Hasser tried to run him off the road.  On July 24, 2015, the Neighbors, Theresa, and Hasser filed a false police report about loud music and vehicles parked in Thompson's backyard.

Between 2015 and 2017, Village police and code enforcement officers threatened Thompson, stating that he had no authority to be on or perform work on the investment property. On July 22, 2015, the Lynches' son Michael trespassed on Thompson's investment property, removed all of the orange cones that Thompson had placed at the driveway entrance, and threw them in the grass.  Thompson called the police, who arrested Michael.  But because the police did not provide Thompson with Michael's court date, the charges against Michael were dropped. Between 2016 and 2018, Village police and code enforcement officers taped numerous code violations and police tickets to the front door of Thompson's investment property, which he had

4

to pay before selling the property. Among other violations, they issued tickets for the burned car.

In August 2016, Thompson finished remodeling the investment property and retained a real estate broker to sell it. On August 10, 2016, the Village, through Hasser, and a Safebuilt[2] employee notified Thompson's broker in writing and over the phone that the Village had a complaint pending that Thompson had no authority to rent the property and instead was a squatter. In response, Thompson's broker withdrew the listing, forcing Thompson to contract with another broker to sell the property. The same day as the notification to Thompson's broker occurred, Thompson asked to speak with Farquhar, who served as the Village mayor before Theresa, about the continued harassment he experienced. The conversation never happened, as Farquhar was charged with aggravated battery that same day. On August 29, 2017, two Village employees arrived at Thompson's house concerning a call about Thompson burning things in his yard. Thompson had paid for permits to build a brick paver patio and fireplace, however.

In the summer of 2018, Thompson and KRT's mother had a custody dispute. The mother went to the Village police, asking for their help to remove KRT from Thompson's custody. On July 10, 2018, Officers Lazzaroni and Martin removed KRT from Thompson's custody without a court order or DCFS investigation. Thompson then filed emergency motions with the court, and KRT returned to his custody approximately a month later. After the incident, Officers Lazzaroni, Martin, and Ludwig, and Chief Koerner fabricated police reports related to their interactions with Thompson's lawyer, Timothy Tyler, surrounding the custody dispute.

In March 2019, Erwin yelled to Thompson that he needed to move his campers from his driveway. The next day, the Village issued a citation to Thompson for the camper not being far

---

[2] Safebuilt describes itself as a "comprehensive community development services provider offering a wide range of support to jurisdictions, public agencies and developers," including "building department and professional services." www.safebuilt.com.

enough into his driveway. On July 2, 2019, Thompson noticed an African American woman crying in the street near an Amazon truck in a ditch in front of Hasser's house. The woman told Thompson that Hasser ran her off the road and said, "Black bi--- don't come back in this neighborhood or else." Doc. 70 ¶ 54. Thompson pulled the truck out of the ditch, but the police report does not record Thompson's assistance in the matter or his speaking with the police about Hasser doing similar things to him. In August 2019, David banged on Thompson's door loudly and, when Thompson opened it, asked him if he had left dog poop on the Lynches' back door. On May 7, 2021, Farquhar, Hasser, and the Neighbors sent an anonymous email to the Illinois Attorney Registration and Disciplinary Commission, stating that Thompson, a neighbor, had been investigated for impersonating an attorney and is a convicted felon. It noted that his car had magnetic signs advertising TLG, a legal group, and included a photo of the signage on his car and camper.

At times, on his way to the local gas station, Thompson would pass Theresa's house and observe Village police cars. Thompson would make a U-turn to return to his house, after which police would follow him and inform him of anonymous complaints they had received, such as having a trailer, ATV, or RV on the grass, visible garbage cans, loud music, or burning wood or paper. Thompson also observed Defendants driving by his house on a daily basis in order to harass and intimidate him.

After experiencing continued harassment related to his RV, in March 2021, Thompson placed his RV in a storage facility, which cost him $264.32 a month. In September 2021, Thompson took his RV out of storage and placed it in the rear of his house on the grass. On March 16, 2022, Biris complained about Thompson's camper being on the grass in the rear of his house. Thompson had observed many other residents in Monee, including the person who

6

bought his investment property, with boats, campers, and trailers on their grass, however. He therefore showed Biris the two campers on the grass at his neighbor's property and also informed Biris of eight other houses with campers, boats, and trailers parked in the grass on their properties. Specifically, Thompson highlights that 5215 W. Main Street has a trailer in its driveway and 5203 W. Court Street, located 0.1 miles from the Village Hall and directly across from the Village employee parking lot, has had a camper on grass in the front yard for over two years. The owners of 5203 W. Court Street had not received any warnings, fines, citations, or tickets before Thompson filed his lawsuit. The Village asked the property owners to relocate their RV four weeks after Thompson filed suit.

On May 25, 2022, Thompson solicited quotes to build a concrete pad at the rear of his property along with a new driveway and landscaping. On June 1, 2022, Thompson retained the services of a subcontractor to help him excavate and pour concrete for the concrete pad. Thompson obtained the necessary permits from the Village. On July 3, 2022, Thompson decided to complete a new driveway and undertake other projects as well. On August 22, 2022, the Village started writing tickets for Thompson having a trailer on the grass, but Thompson had no other place to put his RV during construction.

On March 15, 2023, Roberta walked to Thompson's garage door and asked him to do something about his LED lights because they shone through her front window at night. On April 12, 2023, while Thompson had the garage doors open and a garden utility cart at the end of his driveway, Koss handed Thompson a code compliance notice that he had garbage or recycling cans in public view and had to resolve the issue before 8 a.m. the next day. When Thompson questioned Koss about the warning, Koss responded that he did not see Thompson outside working in his yard when he wrote the warning. Koss then drove away, and Thompson called

the Village police to file a complaint about the harassment. On April 25, 2023, Roberta again came to Thompson's door to complain about his LED lights. Thompson called the Village police and asked them to tell Roberta to stop trespassing on his property. Ludwig responded by asking Thompson what could be done "to squash this." Doc. 70 ¶ 77. Thompson responded that the police should tell Roberta to move, to which Ludwig replied that "the Village will just keep giving [Thompson] tickets." *Id.* The house directly next to Erwin and Roberta also has LED lights about which they apparently have not complained.

After April 25, 2023, police and code enforcement officers started driving by Thompson's house more frequently and writing tickets to cars parked in front of the house. One ticket, written on April 26, 2023 at 1 a.m., carried a $75 fine. At the same time, police did not issue tickets to cars parked in front of the house next to Thompson's. On April 28, 2023, David drove his lawnmower to Thompson's mailbox and asked Thompson why he called the police on Roberta. David indicated that Thompson needed to be careful and watch himself "unless [he] want[s] more problems" because "this is our Town." *Id.* ¶ 79.

On July 19, 2023, Thompson began working on his car in his driveway. On July 21, 2023, Koss approached Thompson and indicated that he needed to perform the repairs in his garage instead of outside. Koss wrote Thompson a code compliance notice for having an inoperable vehicle and required Thompson to resolve the issue before 8 a.m. on July 25, 2023. That same day, Thompson contacted the Village police to express his continued feelings of being targeted and harassed. He showed Cresenti around his property, pointing out his neighbor's camper on the grass and the dismantled vehicles at houses around him. Thompson also noted that his neighbor had a crashed vehicle in their driveway for sixteen months, and another house two minutes from the police station had a car on jacks in its driveway for thirteen months.

Neither property owner received any warning, fines, citations, or tickets for these alleged infractions. As of June 4, 2024, Thompson's neighbors had a disabled vehicle junked for parts in their grass.

On August 25, 2023, at 12:49 a.m., Erwin and Roberta called the Village police to complain that Thompson was sitting in front of his pond. Police officers arrived at Thompson's house around 1:30 a.m. and shone their spotlights on Thompson and his house. On June 6, 2024, Thompson opened his garage door at 10:37 a.m. to perform exterior maintenance on his property, only to have a code enforcement officer arrive fourteen minutes later. Later that day, Thompson walked out his front door to water his plants and feed his fish. A Village police car pulled up fifteen minutes later.

Upon complaining to Village police officers about harassment, Thompson has received various responses. These include explanations about the anonymity of the complaints but that he already knew who made them, that his "neighbors don't like [him] why do[esn't] [he] just pack up and go," that he knew his "neighbors are going to run [him] out of the neighborhood," and that he should "[j]ust try and comply." Doc. 70 ¶ 95.

Thompson received at least 129 verbal and written warnings, tickets, citations, and fines about violations of Village ordinances. Due to the tickets, the Village has an administrative lien for over $10,000 against Thompson's property. Thompson does not believe that any other resident in his subdivision has received a citation for having trailers or campers on the grass or warnings, complaints, or tickets for having a garbage can outside, a car on the grass, an ATV on the grass, or any other nuisance. Thompson's house is on the last cul-de-sac in his subdivision, meaning that police and code enforcement officers had to go out of their way to find violations. He complains that eight out of ten times when he left his house, code enforcement or police

officers would drive by his property within fifteen minutes, reportedly due to the Neighbors having called to report his movements. After Thompson filed this lawsuit, on October 12, 2023, Officer Koss parked in front of Thompson's house for fourteen minutes and observed Thompson while he worked outside.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. KRT's Claims

Defendants argue that the Court should dismiss KRT as a plaintiff because she has not alleged an injury and so lacks standing to sue. While the first amended complaint includes allegations about KRT living with Thompson, the only allegations related to her specifically arise in the context of the IIED claim, concerning a custody dispute in which the Village police required Thompson to turn KRT over to her mother, with whom she stayed for approximately

thirty days before returning to live with Thompson. According to the first amended complaint, KRT "was emotionally distraught, hurt, depressed, sad because she had not seen her father or puppy in over 30 days and the mother was a non-active parent in KRT's life," Doc. 70 ¶ 174, and she required two years "to rebound from the emotional Trauma that the [Monee Police Department] put [her] through," *id.* ¶ 175.

The Court need not resolve whether KRT has standing, however, because a more fundamental issue bars KRT's claims from proceeding in this case. Thompson has appeared *pro se* on behalf of himself and KRT, a minor. "While litigants in federal court have a statutory right to proceed *pro se* and Rule 17(c) allows a guardian to sue on behalf of a minor, a nonlawyer parent may not proceed *pro se* on behalf of a child under Rule 17(c)." *Piphus v. City of Chi. Police Dep't*, No. 12 cv 7259, 2013 WL 3975209, at *3 (N.D. Ill. Aug. 1, 2013); *see also Foster v. Bd. of Educ.*, 611 F. App'x 874, 877 (7th Cir. 2015) ("[T]he rule prohibiting a nonlawyer from representing another person extends to a parent attempting to represent her minor child pro se."). This is because "the choice to appear pro se is not a 'true choice' for minors and therefore they are entitled to trained legal assistance so that their rights may be fully protected." *McPherson v. Sch. Dist. No. 186*, 32 F. App'x 769, 770 (7th Cir. 2002) (citation omitted). Because Thompson cannot represent KRT's interests while proceeding *pro se*, the Court dismisses KRT's claims and only considers Thompson's claims.

## II. Federal Claims

### A. Statute of Limitations for § 1983 Claims

The statute of limitations is an affirmative defense that Thompson need not anticipate in his first amended complaint to survive Defendants' motions to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). But that is not the case where "the allegations of the

complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint reveals that an action is untimely under the governing statute of limitations." *Id.*; *see also Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (considering statute of limitations defense on motion to dismiss where the complaint set forth the relevant dates in the complaint).

A two-year statute of limitations applies to Thompson's § 1983 claims. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 805 (7th Cir. 2008). Defendants argue that Thompson's claims based on incidents that occurred before September 18, 2021, in other words, over two years before he filed this case on September 18, 2023, are time-barred. Thompson responds that the continuing violation doctrine applies and makes all of the conduct of which he complains actionable. The continuing violation doctrine "allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Id.* at 801. But here, each individual instance of which Thompson complains created a separate and distinct injury, meaning that the continuing violation doctrine does not apply. *See Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir. 2010) ("The continuing violation doctrine . . . does not apply to 'a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing.'" (quoting *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005))); *Chambers v. Vill. of Oak Park*, No. 22-cv-6008, 2024 WL 3292814, at *5 (N.D. Ill. July 3, 2024) (rejecting application of continuing violation doctrine to equal protection class-of-one claim); *Ghashiyah v. Jess*, No. 21-CV-1479, 2023 WL 5558825, at *4 (E.D. Wis. Aug. 29, 2023) ("Although there was a pattern of Defendants not allowing Plaintiff to use his legal name, Plaintiff cannot use an independent predicate to 'act as a bootstrap to recover for injuries caused by earlier predicate acts that took place outside the limitations period.'" (quoting *Limestone*, 520 F.3d at 802)). The Court therefore dismisses with prejudice Thompson's federal

claims based on events occurring before September 18, 2021, and it only considers his federal claims based on conduct that occurred after that date.

### B.     Personal Involvement of the Village Individual Defendants

Having narrowed Thompson's federal claims to conduct that occurred after September 18, 2021, the Court next addresses arguments concerning the Village Individual Defendants' involvement in actionable conduct. "[T]o be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act."). Personal liability exists where the conduct occurred at the defendant's direction or with his or her knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In other words, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

Turning to the individual officers first, Thompson does not include allegations of Koerner's, Martin's, Lazzaroni's, Drum's, or Blake's conduct that occurred after September 18, 2021. Without any such allegations, Thompson's federal claims against them fail. As for Farquhar, his last noted involvement is allegedly sending an anonymous email to the ARDC in May 2021, with Thompson acknowledging that he no longer served as the Village mayor in the two years prior to the filing of the complaint. Thompson therefore cannot proceed against Farquhar based on any supervisory role he previously held. Theresa, however, served as mayor during the relevant time period, and, along with Hasser, the Village clerk, allegedly directed code

13

enforcement and police officers to harass Thompson. These allegations suffice at this stage to tie Theresa and Hasser to the allegedly unconstitutional conduct. *See Gentry*, 65 F.3d at 561 (a supervisor may be held liable where they knew "about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye" to it).

Finally, Biris, Koss, and Ludwig argue that Thompson cannot hold them responsible because he only alleges that each of them had one contact with him during the relevant time period. But these contacts sufficiently indicate some participation in the alleged constitutional violations, and so the Court will not dismiss these defendants at this stage.

### C. Conspiracy Claims

Although the Court finds that Thompson has not sufficiently alleged the personal involvement of certain defendants for purposes of his § 1983 claims, he may alternatively proceed against them based on a conspiracy theory.[3] To support conspiracy liability under § 1983, Thompson must allege "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

"[M]erely private conduct, no matter how discriminatory or wrongful," cannot lead to § 1983 liability. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted). "[A] private citizen can act under color of law if there is 'evidence of a *concerted effort* between a state actor and that individual.'" *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019)

---

[3] Thompson cites to 18 U.S.C. § 241, which makes it a crime to conspire to "injure, oppress, threaten or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." But a private individual cannot enforce this criminal statute. *See Chapa v. Adams*, 168 F.3d 1036, 1037 (7th Cir. 1999) ("Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action."); *Crosby v. Catret*, 308 F. App'x 453 (D.C. Cir. 2009) ("The district court properly rejected appellant's attempt to invoke 18 U.S.C. § 241 and 18 U.S.C. § 242 to initiate a prosecution against the named defendants because there is no private right of action under these criminal statutes.").

(citation omitted).  To establish § 1983 liability for a private actor, "a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents."[4]  *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000) (citation omitted).  "It is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal.  There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (citation omitted). "[M]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss."  *Spiegel*, 916 F.3d at 616 (citation omitted).  Instead, Thompson must provide "some factual allegations suggesting such a 'meeting of the minds.'" *Tarkowski*, 644 F.2d at 1206 (citation omitted).  Circumstantial evidence can establish a conspiracy, but speculation cannot.  *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

Thompson alleges that Defendants agreed to force Thompson to move by any means necessary.  The Neighbors contend that Thompson's allegations do not suggest such an agreement, and that calling the police alone cannot form the basis for such an agreement.  The Court agrees that Plaintiffs' allegations fall short to show that the Neighbors entered into an agreement with the Village Individual Defendants to force Thompson to move from Monee.

---

[4] Thompson could also attempt to pursue a conspiracy claim against the Neighbors under § 1985(3), under which he would have to allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to a person or property or a deprivation of a right or privilege granted to U.S. citizens." *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002).  Additionally, Thompson would have to allege that the defendants acted out of some "class-based, invidiously discriminatory animus" and that the rights with which defendants interfered are protected against private encroachment.  *Id.*  But because Thompson alleges that the Neighbors conspired with state actors, the Court finds it more appropriate to address the conspiracy claims under § 1983 instead of § 1985(3).

Thompson alleges that the Neighbors live close to him and that they presumably made phone calls that caused code or police officers to arrive at his house shortly after he left it. The Neighbors' "'mere act of furnishing information to law enforcement officers' does not constitute joint activity," however. *Spiegel*, 916 F.3d at 617 (quoting *Butler v. Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir. 1978)). And as in Thompson's prior case, Thompson's remaining conclusory allegations of a conspiracy as to the Neighbors do not suffice. *See Thompson v. Vill. of Monee*, No. 12 C 5020, 2013 WL 3337801, at *7–8 (N.D. Ill. July 1, 2013) (dismissing conspiracy claim where Thompson did not include any "factual allegations of any explicit meeting or directive between the Neighbors and the officers"). Therefore, Thompson cannot pursue any federal claims against the Neighbors.

As for the Village Individual Defendants, a pattern of harassment, coupled with allegations of an agreement and scheme, may suffice to state a conspiracy claim. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) ("If several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion. Geinosky's allegations of a conspiracy among the officers of Unit 253 to harass him by issuing bogus parking tickets go well beyond the required threshold."); *Thompson*, 2013 WL 3337801, at *8 (allowing conspiracy claim to proceed against officers based on a pattern of harassment by the various officers over a period of time, relying on *Geinosky*). Here, the Village Individual Defendants argue that Thompson has not sufficiently alleged a pattern from which the Court can infer an agreement. While the events that occurred within the limitations period may not be as egregious as those in *Geinosky*, the Court can hold individuals who had no involvement in the events within the limitations period

liable for the actions of their co-conspirators that occurred during the limitations period as long as they did not withdraw from the conspiracy. *Geinosky*, 675 F.3d at 749–50. Here, the Court finds Thompson's allegations insufficient to plausibly plead that all of the Village Individual Defendants continued to conspire to violate his constitutional rights, where Thompson's first amended complaint indicates that Farquhar left his government position prior to the limitations period and includes no indication as to which of the other Village Individual Defendants, aside from Theresa, Hasser, Biris, Koss, and Ludwig, remained employed by the Village during this time.[5] Therefore, while the Court finds that Thompson has sufficiently suggested a conspiracy among Theresa, Hasser, Biris, Koss, and Ludwig, the Court dismisses the remaining Village Individual Defendants. Having resolved these questions, the Court turns to the sufficiency of Thompson's federal claims.

### D. Equal Protection Claim

To adequately plead a class-of-one equal protection claim, Thompson must "allege facts plausibly suggesting that [ ]he was 'intentionally treated differently from others similarly situated' and 'there is no rational basis for the difference in treatment.'" *Van Dyke v. Vill. of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020) (citation omitted). Because of its discretionary nature, selective or incomplete enforcement of the law does not, by itself, constitute a violation of the Fourteenth Amendment; in fact, such enforcement "is the norm in this country." *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985); *see also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604 (2008) ("[A]llowing an equal protection claim on the ground that a [speeding] ticket was given to one person and not others, even if for no discernible or articulable

---

[5] The first amended complaint includes some indications that Hasser left his position as Village Clerk during the limitations period. Even assuming that Hasser left his position before the limitations period, Thompson's allegations suggest that he conspired with his wife and other Village employees throughout the limitations period, and so the Court allows Thompson to proceed with his conspiracy claims against Hasser at this time.

reason, would be incompatible with the discretion inherent in the challenged action."); *Esmail v. Macrane*, 53 F.3d 176, 178–79 (7th Cir. 1995) (finding that selective prosecution in the form of a government's "fail[ure] to prosecute all known lawbreakers . . . has no standing in equal protection law," even though "it involves dramatically unequal legal treatment," with some people "being punished and others getting off scot-free"). Thus, "an exercise of prosecutorial discretion, unless based on some invidious discrimination, is not typically a basis for a class-of-one challenge." *Van Dyke*, 819 F. App'x at 432. In other words, Thompson can only state a claim based on selective enforcement if he alleges invidious discrimination—action that is "wholly arbitrary" and "inconsistent with the Fourteenth Amendment." *Frederickson v. Landeros*, 943 F.3d 1054, 1060 (7th Cir. 2019) ("[W]e have recognized that a party may allege that this type of 'invidious' action—wholly arbitrary, inconsistent with the Fourteenth Amendment—is the only factor distinguishing the target from the rest of the population, and that such a showing suffices to prove the lack of a rational basis."); *see also McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (plaintiff must show "that there is no rational basis for the difference in treatment *or* the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant" (emphasis added) (citations omitted)); *Fenje v. Feld*, 398 F.3d 620, 628 (7th Cir. 2005) (acting "'out of sheer malice,' 'vindictiveness,' or 'malignant animosity' would state a claim for relief under the Equal Protection Clause" (quoting *Esmail*, 53 F.3d at 178–79)).

Defendants do not contend that a rational basis existed for the actions of which Thompson complains, instead arguing that Thompson has not shown an "extraordinary pattern of baseless tickets" as required to allege a class of one claim. Doc. 87 at 9 (quoting *Geinosky*, 675 F.3d at 747). While they correctly point out that Thompson only alleges that he received five

tickets or warnings during the relevant time period, he also provides broader allegations of harassment, including Village police and code enforcement officers excessively patrolling his property, during this time period from which the Court can reasonably infer a pattern of discrimination.[6] And while falling outside the relevant time period, Thompson points to a long history of harassment that plausibly suggests that animus motivated the harassment he experienced. *See Frederickson*, 943 F.3d at 1062 ("Class-of-one complaints typically allege that a defendant has either a personal financial stake or some history with the plaintiff, and that this stake or history demonstrates both the lack of a rational basis for the action and animus.").

Defendants additionally argue that Thompson has not sufficiently pleaded that they treated other similarly situated individuals differently, contending that Thompson has not alleged whether the allegedly similarly situated individuals were cited for the offending conditions, had complaints made against them or had themselves made complaints to the Village, or had the same or different backgrounds as Thompson. However, "[a]s a general rule, whether individuals are similarly situated is a factual question for the jury." *McDonald*, 371 F.3d at 1002. Thus, "[p]laintiffs alleging class-of-one equal protection claims do not need to identify specific examples of similarly situated persons in their complaints." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (alteration in original) (citation omitted); *see also Geinosky*, 675 F.3d at 748 n.3 (finding "no basis for requiring the plaintiff to identify the [similarly situated] person *in the complaint*"). Moreover, Thompson has identified various examples of individuals who did not receive tickets for allegedly similar violations. Because Thompson need not provide the

---

[6] The Court acknowledges that "allegations of stalking, harassment, offensive language, and even threats by a public official are legally insufficient to support an equal protection or other constitutional claim" on their own. *Chavarin v. Westchester Pub. Libr. Bd. of Trs.*, No. 15 C 2040, 2015 WL 5117859, at *3 & n.3 (N.D. Ill. Aug. 28, 2015). But here, the Court considers them in conjunction with Thompson's other allegations of allegedly differential treatment.

additional details requested by Defendants at the pleading stage, the Court will allow Thompson to proceed to discovery on his equal protection claim.

**E.     Due Process Claims**

Thompson appears to pursue both procedural and substantive due process claims.  To state a substantive due process claim, Thompson must provide "allegations of conduct under color of state law that violated a fundamental right or liberty and was so arbitrary and irrational as to shock the conscience." *Robbin v. City of Berwyn*, 108 F.4th 586, 589 (7th Cir. 2024) (citation omitted) (internal quotation marks omitted).  This "high standard" exists "to avoid constitutionalizing every tort committed by a public employee." *Geinosky*, 675 F.3d at 750. Here, Thompson has not pleaded conduct that "shocks the conscience," and so he cannot proceed on his substantive due process claim.[7]  *See Robbin*, 108 F.4th at 591 ("[B]ehavior that is shocking enough to sustain a substantive due process claim typically involves the use of intentional force against an individual's person or the threat of such force.  By contrast, mere verbal harassment, threats, or annoyances alone fail to clear the high bar." (citations omitted)); *Geinosky*, 675 F.3d at 750 (affirming dismissal of substantive due process claim based on the plaintiff's receipt of twenty-four bogus parking tickets).

As for procedural due process, Thompson complains that the Village issued him tickets and citations without providing him with notification of the violations or an opportunity to contest them.  To state a valid procedural due process claim, Thompson must allege that Defendants deprived him of a protected liberty or property interest without adequate process. *Brown v. City of Mich. City*, 462 F.3d 720, 728 (7th Cir. 2006).  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."

---

[7] The Court questions whether Thompson has adequately pleaded the violation of a fundamental right, but because Defendants do not make this argument, the Court does not dismiss the claim on this basis.

*Carmody v. Bd. of Trs.*, 747 F.3d 470, 474 (7th Cir. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Here, Thompson's first amended complaint forecloses a procedural due process claim with respect to any tickets and citations issued after September 18, 2021. Thompson includes these citations in his pleadings and admits that he received them. And the citations include information about a hearing date and other instructions as to how to resolve the citation. *See, e.g.*, Doc. 71-1 at 6, 18. Because Thompson's pleadings reveal that he received notice and an opportunity to be heard with respect to any citations that occurred during the limitations period, he cannot proceed on a procedural due process claim. *See Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 101 (1993) (if the state "'offers a meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing,' the 'availability of a predeprivation hearing constitutes a procedural safeguard . . . sufficient by itself to satisfy the Due Process Clause'" (citation omitted)); *Pugel v. Bd. of Trs.*, 378 F.3d 659, 662 (7th Cir. 2004) ("The hallmarks of procedural due process are notice and an opportunity to be heard."). To the extent that Thompson complains about receiving multiple tickets on the same day without receiving notification of those tickets, all of those instances occurred between 2007 and 2009, *see* Doc. 70 ¶¶ 23–24, and so are not actionable in this lawsuit. The Court therefore dismisses Thompson's due process claims.

F.     **First Amendment Retaliation Claim**

To state a First Amendment retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783

(7th Cir. 2015)).  Defendants only challenge the second element, whether Thompson suffered a deprivation that would deter future First Amendment activity.  This element requires an objective inquiry, determining "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (quoting *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020)).  "Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, [the Court] can resolve the issue as a matter of law." *Douglas*, 964 F.3d at 647.  Defendants argue that the timely conduct at issue involves two warnings and two citations for code violations over a matter of two years, amounting to a minimal injury.  But the Court finds it inappropriate to make this determination at the pleading stage.  *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It is a question of fact whether [a campaign of harassment] reached the threshold of actionability under section 1983."); *Brewer v. Town of Eagle*, 663 F. Supp. 3d 909, 932–33 (E.D. Wis. 2023) (a reasonable jury could find defendants' conduct in signing off on a complaint against the plaintiffs, deciding whether to enforce ordinances against them, and pursuing code violations against them when they might not have otherwise done so sufficiently severe to meet the second element of a First Amendment retaliation claim).  The Court therefore allows Thompson's First Amendment retaliation claim to proceed to discovery.

### G.    *Monell* Liability

Finally, the Court considers whether Thompson has sufficiently alleged a basis to hold the Village liable.  Although Thompson cannot hold the Village vicariously liable under § 1983 for the actions of its employees, *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015), he can attempt to hold the Village liable for its "own violations of the federal Constitution and

laws," *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).  To state a *Monell* claim, Thompson must allege: "(1) [he] was deprived of a constitutional right; (2) the deprivation can be traced 'to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault, i.e., deliberate indifference'; and (4) 'the municipal action was the moving force behind the federal-rights violation.'"  *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023) (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021)).  Thompson can show municipal action through allegations of (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority.  *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

In the first amended complaint, Thompson alleges that the Village fails to adequately train its officers in the use of their official powers and that Bogs, Farquhar, and Hasser served as final policymakers.  In response to the motion to dismiss, Thompson focuses only on whether Bogs served as a final policymaker, and so the Court does the same.

"In order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'"  *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (alteration in original) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)).  Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority.  *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999).  Courts

look at "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Mitchell v. Vill. of Dixmoor*, No. 20 C 436, 2021 WL 3603625, at *5 (N.D. Ill. Aug. 13, 2021). And, importantly, "the question is whether the plaintiff has identified the decisionmaker 'responsible for establishing final policy with respect to the subject matter in question.'" *Snyder v. King*, 745 F.3d 242, 249 (7th Cir. 2014) (citation omitted) (finding local voter registration boards are not policymakers because they "simply do not make an independent policy judgment"); *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009) ("Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue[.]'" (citation omitted)).

Here, the Court agrees that Thompson makes only conclusory assertions about Bogs' policymaking authority. Thompson parrots allegations that another court found sufficient to state a *Monell* claim based on the alleged final policymaking authority of the mayor. *See Cozzi v. Vill. of Melrose Park*, 592 F. Supp. 3d 701, 714–16 (N.D. Ill. 2022). But in *Cozzi*, the complaint provided great detail about the mayor's authority and command over all Village business and, more specifically, over enforcement of the Village code. *Id.* Here, on the other hand, Thompson has not provided more than the buzzwords that the *Cozzi* court used to suggest that Bogs had similar authority. That does not suffice to meet his pleading burden. *See Reed v. Gallegos*, No. 23-CV-002247, 2024 WL 4826495, at *5 (N.D. Ill. Nov. 19, 2024) (plaintiff's "bare assertions" about the police superintendent's "implementation of a specific policy or practice that was directly traceable to Plaintiff's injuries" did not suffice to state a *Monell* claim);

24

*Billups-Dryer v. City of Dolton*, No. 20 C 1597, 2022 WL 1693486, at *5–6 (N.D. Ill. May 26, 2022) ("Courts routinely require more of plaintiffs than conclusory allegations that a hypothetical decision-maker caused them harm. A degree of particularity is required, even at this stage of the litigation, to withstand a motion to dismiss." (collecting cases)). The Court therefore dismisses Thompson's § 1983 claims against the Village.

## III.     State Law Claims

### A.     IIED

To state an IIED claim, Thompson must allege that "(1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) defendants' conduct actually caused severe emotional distress." *Lifton v. Bd. of Educ.*, 416 F.3d 571, 579 (7th Cir. 2005) (quoting *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 935 (2004)). For conduct to rise to the level of extreme and outrageous, it "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 21 (1992)). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not suffice. *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). "Whether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745 (2000). Courts examine the degree of power the defendant held over the plaintiff; whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge; and whether the defendant reasonably

believed that his objective was legitimate.[8]  *Cairel v. Alderden*, 821 F.3d 823, 835–36 (7th Cir.

2016) (describing Illinois law).

The Neighbors argue that Thompson has not plausibly alleged extreme and outrageous

conduct.  They point out that Thompson only claims that they made false allegations to the

police and minor comments to Thompson about moving a camper, stopping a light from shining

in their window, and whether Thompson had left dog feces at the Lynches' house.[9]  Thompson

also appears to complain about the Neighbors trespassing on his property and the Lynches' son

allegedly setting Thompson's son's car on fire.  But even taken together, the allegations against

the Neighbors do not rise to the level of extreme and outrageous conduct.  *See Thompson*, 2013

WL 3337801, at *23 (allegations that neighbors called the police and made false allegations

about the plaintiffs to the police did not go "beyond all bounds of decency to constitute

intentional infliction of emotional distress"); *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 437–38,

447–52 (2005) (allegations that the defendants conducted 24-hour surveillance of the plaintiffs'

property, made "hundreds" of calls to the police that caused the police to issue ordinance

violation notices, and caused other investigations into the plaintiffs' activities did not amount to

extreme and outrageous conduct); *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966,

973 (1991) (allegedly false statements to the police about plaintiff harassing, assaulting, and

verbally threatening a co-worker, while likely "creat[ing] some distress and embarrassment for

---

[8] Defendants do not argue that the statute of limitations limits the scope of the IIED claim, and so the Court considers the entirety of the conduct alleged in determining whether Thompson has stated an IIED claim.  Indeed, an IIED claim may constitute a "continuing tort," meaning that the claim "accrues, and the statute of limitations begins to run, at the time the last injurious act occurs or the conduct is abated." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 285 (2003).

[9] The Court notes that, as the Neighbors point out, in his prior lawsuit, Thompson made allegations about other neighbors that he has repeated in his first amended complaint, only now claiming that the Neighbors named as Defendants in this case were the ones who took the complained of actions, not the neighbors named in his prior case.  *See Thompson*, 2013 WL 3337801, at *1–3, 23 (recounting the factual allegations in Thompson's prior case).

plaintiff" and "subject[ing] plaintiff to some indignities," did not rise to the level required to state extreme and outrageous conduct); *cf. Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 245–47 (1990) (plaintiff's cumulative conduct towards defendant, which included threats to kill her, rape her, and file a lawsuit to take custody of her son away from her, offers of money for sex on numerous occasions, and the spreading false information about her and her new employer, could support a finding of outrageous conduct).

The Village Individual Defendants also focus on whether the alleged conduct rises to the level required to be considered extreme and outrageous, claiming that Thompson has included only conclusory allegations of such conduct. But the Court disagrees. Thompson's first amended complaint alleges a pattern of harassment and abuse of power by Village officials, with specific examples, which he claims the Village Individual Defendants undertook in an attempt to intimidate Thompson and force him to move out of the Village. At this stage, these allegations suffice to suggest extreme and outrageous conduct. *See McGrath*, 126 Ill. 2d at 86–87 ("The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment. Threats, for example, are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out then when made by someone in a comparatively weak position."); *Lynch v. Young*, No. 04 C 5136, 2005 WL 946881, at *4 (N.D. Ill. Mar. 9, 2005) ("Plaintiffs here allege a series of abuses of official power, threats, and slander by law enforcement officers and city officials, all orchestrated in an attempt to harass, intimidate, and frighten plaintiffs, their families, and their friends. . . . The court finds that the average community member would be profoundly troubled by plaintiffs' allegations, and that they are sufficiently 'extreme and outrageous.'").

Therefore, the Court will allow Thompson to proceed with his IIED claim against the Village Individual Defendants.

### B.    Harassment

Thompson also brings a state law harassment claim against the Neighbors, contending that they continually harassed Thompson and his family, including by engaging in stalking behavior and trespassing on Thompson's property. The Neighbors argue that no such state law claim exists and that Thompson merely attempts to restate his IIED claim using different terminology. Thompson does not specifically respond to this point, instead just reasserting his allegations of harassment. But because Thompson has not pointed the Court to any authority for pursuing a common law harassment claim, and the Court has not located any Illinois caselaw supporting such a claim, the Court dismisses Thompson's harassment claim with prejudice. To the extent that Thompson alleges that the Neighbors' allegedly harassing behavior caused him emotional distress, he may attempt to reallege his IIED claim against them.

### C.    Civil Conspiracy

The analysis for Thompson's state law conspiracy claim largely mirrors that for the federal conspiracy claim. A civil conspiracy claim under Illinois law requires allegations of "(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act." *Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, ¶ 20. The Court adopts its conclusion with respect to the Neighbors, finding that Thompson has not sufficiently alleged that they entered into an agreement with the Village Individual Defendants or each other to force Thompson to move from Monee. But because the first amended complaint sufficiently suggests

a basis to infer that the Village Individual Defendants all agreed to engage in actions to drive Thompson out of town and the Village Individual Defendants have not asserted a limitations defense to the IIED claim, the Court finds that Thompson may proceed on his state law conspiracy claim against all of the Village Individual Defendants.

>    **D.    Indemnification**

Finally, the Village seeks dismissal of the indemnification claim, arguing that it fails because no underlying claim against the Village Individual Defendants may proceed. But because the Court finds that Thompson may proceed against at least some of the Village Individual Defendants on some of his claims, his indemnification claim against the Village must proceed as well.

**CONCLUSION**

For the foregoing reasons, the Court grants the Neighbors' motion to dismiss [83] and grants in part and denies in part the Village and the Village Individual Defendants' motion to dismiss [87]. The Court dismisses KRT's claims and terminates her as a Plaintiff. The Court dismisses all claims against Erwin Bogs, Roberta Bogs, David Lynch, and Judith Lynch. The Court dismisses with prejudice Thompson's federal claims based on events occurring before September 18, 2021. With respect to post-September 18, 2021 events, the Court dismisses the due process claim (Count II) and the *Monell* claim (Count IV) without prejudice. The Court dismisses all federal claims based on post-September 18, 2021 events against Blake, Drum, Farquhar, Koerner, Lazzaroni, and Martin without prejudice.

Dated: February 20, 2025

>    SARA L. ELLIS
>    United States District Judge

29