**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KENNETH THOMPSON, SR., and )
KRT, a minor, )
)
      Plaintiffs, )
) No. 23 C 13982
      v. )
) Judge Sara L. Ellis
THE VILLAGE OF MONEE, an Illinois )
municipal corporation, MAYOR THERESE )
BOGS, WAYNE HASER, RUBEN )
BAUTISTA, ROMULUS BIRIS, MICHAEL )
KOS, ROXANNE WILLIAMS, )
ERWIN BOGS, ROBERTA BOGS, )
DAVID LYNCH, JUDITH LYNCH, CHIEF )
SCOTT KOERNER, EVIE LAZZARONI #715, )
JAMAL MARTIN #707, WILLIAM LITTLE )
#728, ANTHONY LAZZARONI, )
)
      Defendants. )

**OPINION AND ORDER**

Plaintiff Kenneth Thompson and his minor daughter, KRT, live in the Village of Monee

(the "Village"), where their neighbors and Village officials have allegedly subjected them to

harassment. The Court previously narrowed the claims Thompson raised in his first amended

complaint. Doc. 105. In response, Thompson filed a second amended complaint, claiming that

the Village's "illegitimate animus toward [Thompson] over the past twenty years has demanded

that [Thompson] present his story in a 145-page, second-amended complaint with 101 supporting

exhibits." Doc. 186 at 6. In the second amended complaint, Thompson and KRT raise claims

for violation of their equal protection, due process, and First and Fourth Amendment rights,

federal and state conspiracy, and intentional infliction of emotional distress ("IIED"). Thompson

also seeks indemnification from the Village for any acts of its employees. He names as

Defendants Erwin Bogs ("Erwin"), Roberta Bogs ("Roberta"), David Lynch ("David"), and Judith Lynch ("Judith," and, collectively with Erwin, Roberta, and David, the "Neighbors"); the Village; and current Mayor Therese Bogs ("Therese"), former Village Clerk Wayne Haser, Village Administrator Ruben Bautista, Code Enforcement Officers Romulus Biris, Michael Kos, and Roxanne Williams, Police Chief Scott Koerner, and Police Officers Anthony Lazzaroni, Evie Lazzaroni, William Little, and Jamal Martin (collectively, the "Village Individual Defendants").[1] All Defendants have filed motions to dismiss Thompson's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] The Court again narrows Thompson's and KRT's claims, only allowing Thompson to proceed with his First Amendment retaliation, IIED, and conspiracy claims against certain of the Village Individual Defendants and the Village.

---

[1] In his first amended complaint, Thompson also named Police Officer Matthew Ludwig as a Defendant, and the Court had allowed certain claims to proceed against him. Although Thompson includes allegations against Ludwig in his second amended complaint, he does not name him as a Defendant, and so the Court does not address Ludwig further in this Opinion.

[2] Thompson spends much of his response brief to the Village Individual Defendants' motion arguing that their motion is procedurally improper because it makes arguments on behalf of all of the Village Individual Defendants, not only the newly-named Defendants, and raises arguments that the Village Individual Defendants could have made when moving to dismiss the first amended complaint. With respect to the first argument, the Court finds it has no merit, as the second amended complaint adds additional allegations against all Defendants and all Defendants, not just the newly-named Defendants, requested an extension of time to file their responsive pleading. *See* Doc. 195. As for the expansion of the issues raised in the motion to dismiss, the Court agrees that the Village Individual Defendants could and should have raised some of the arguments they now make for dismissal of the claims in their motion to dismiss the first amended complaint, particularly given that the second amended complaint does not materially change the allegations related to these claims. *See Burton v. Ghosh*, 961 F.3d 960, 968 (7th Cir. 2020) ("[T]he invitation to answer an amended complaint should be understood as permission to plead in response to the amendments, as contemplated by Rule 15(a)(3), unless leave is expressly given to raise new defenses unrelated to the amendments. In the usual course, this means responding to the new substance of the amended complaint."); Wright & Miller, 5C Federal Practice & Procedure § 1388 ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading."). Nonetheless, the Court finds it appropriate to address the Village Individual Defendants' arguments on their merits given that the parties have fully briefed the issues.

2

## BACKGROUND[3]

Thompson, an African American business owner, has lived at 6644 W. Maple Court in Monee, Illinois since 2005.  His house is in the cul-de-sac in Gorman Farm Estates, which boasts large lots, and is approximately 5.3 miles from the Village Hall.  One of Thompson's children, KRT, a minor, continues to live with him at his house and attends Crete-Monee High School.  Thompson had custody of two minor grandchildren who attended Monee Elementary, but they no longer live with him.  Thompson also owned investment property in the Village, including at 6636 W. Maple Court.

Haser and Therese are married.  Haser served as the Village Clerk for over ten years, while Therese currently serves as the Village Mayor.  Erwin and Roberta, Therese's parents and Haser's in-laws, live directly across the street from Thompson.  Erwin previously served as a member and chairperson of the Village Planning and Zoning Committee.  David and Judith live next door to Erwin and Roberta.

Thompson's issues with his neighbors and the Village began soon after he moved into the Village.  On August 15, 2007, Thompson's son hosted a trunk party to celebrate his enrollment at the University of Illinois Urbana Champaign.  Village police harassed those gathered at the party, arresting two of Thompson's son's friends that night.  On June 21, 2008, Officer Drumm arrived at Thompson's house during his daughter's birthday party and threatened to arrest Thompson after a neighbor called with a noise complaint.  On May 11, 2009, Thompson called Village police to request assistance with a trespasser on his property.  Officer Drumm arrived and tried to arrest Thompson, but Thompson entered his house and locked the door.  Thompson

---

[3] The Court takes the facts in the background section from the first amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motions to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

provided video of the incident to the Village police chief. On July 11, 2009, Thompson hosted a birthday party. The Neighbors made reports to the Village police, falsely alleging that Thompson's family and friends were riding ATVs on their property, playing loud music, and parking cars on neighbors' grass. The Neighbors also complained that Thompson was not cutting his grass and as such bringing down their property values. Officers Lazzaroni,[4] Blake, Crescenti, Fowler, Cash, and Jones made several visits to Thompson's house that day in response, unsuccessfully attempting to arrest Thompson.

In addition to these troubles, between 2007 and 2009, Thompson received numerous citations and tickets, sometimes for the same violation, without receiving copies or notice of the tickets. On August 22, 2007, he received two tickets for an ATV parked on the grass, one for $262 and the other for $392. On August 6, 2009, Thompson received three code violation tickets for the same alleged incident, with each ticket carrying a fine of $1,952. Thompson only discovered these tickets through an online search; the Village never notified Thompson of these tickets or sent him a communication to allow him to contest them.

On July 10, 2010, Thompson hosted a business networking function at his house. The Neighbors again called the Village police with false allegations about Thompson. Officers Lazzaroni, Blake, Crescenti, Fowler, Cash, and Jones arrived at Thompson's house several times that day and unsuccessfully tried to arrest Thompson. Officer Blake attempted to enter Thompson's house, but a residential security agent stopped him from doing so. Officer Blake threatened that he would return to arrest Thompson. The following year, on July 9, 2011, Thompson again hosted a business networking function. The Neighbors, as well as Therese and Haser, made false allegations about Thompson to the police that day. Among other things, they

---

[4] Thompson does not specify whether he refers to Evie or Anthony Lazzaroni with respect to this allegation.

complained about ATV use and loud music, with Haser making the complaint about the music even though he lived over 1/8 of a mile from Thompson.  Officers Lazzaroni, Blake, Crescenti, Fowler, Cash, Jones, and Drumm visited Thompson's house several times that day and again unsuccessfully attempted to arrest Thompson.  The Neighbors also made similar false allegations on July 17, 2011, but nothing came of these allegations.

On June 25, 2012, Thompson filed a case in this District against the Village and other defendants.  *Thompson v. Vill. of Monee*, No. 12 C 5020 (N.D. Ill.).  Although Defendants' actions toward Thompson died down during the pendency of the case, which the court dismissed on June 17, 2015, Defendants continued to harass Thompson.  For example, on September 27, 2012, police and a code enforcement officer arrived at Thompson's investment property and interrogated Thompson about the work he was doing there.  On June 14, 2013, police arrived at the investment property in response to a complaint from a neighbor, later identified as a Village Building Department employee, who complained that the property was vacant.  On September 8, 2014, Thompson filed a complaint with the Village police chief because Blake tried to run Thompson off the road.

The harassment continued after the dismissal of the federal case, with the Neighbors, Therese, and Haser calling and texting Village code enforcement and police officers on a daily basis, prompting the officers to surveil and patrol Thompson's house and issue him warnings, tickets, and fines.  In June 2015, someone set fire to Thompson's son's car, which was parked in the grass on Thompson's investment property and not visible from the street.  Thompson suspects the Lynches' son, Michael, set the fire.  In July 2015, Thompson called 911 because Haser tried to run him off the road.  On July 24, 2015, the Neighbors, Therese, and Haser filed a false police report about loud music and vehicles parked in Thompson's backyard.

Between 2015 and 2018, Village police and code enforcement officers threatened Thompson, stating that he had no authority to be on or perform work on the investment property. On July 22, 2015, the Lynches' son Michael trespassed on Thompson's investment property, removed all of the orange cones that Thompson had placed at the driveway entrance, and threw them in the grass. Thompson called the police, who arrested Michael. But because the police did not provide Thompson with Michael's court date, the charges against Michael were dropped. Between 2016 and 2018, Village police and code enforcement officers taped numerous code violations and police tickets to the front door of Thompson's investment property, which he had to pay before selling the property. Among other violations, they issued tickets for the burned car.

In August 2016, Thompson finished remodeling the investment property and retained a real estate broker to sell it. On August 10, 2016, the Village, through Haser, and a SAFEbuilt[5] employee notified Thompson's broker in writing and over the phone that the Village had a complaint pending that Thompson had no authority to rent the property and instead was a squatter. In response, Thompson's broker withdrew the listing, forcing Thompson to contract with another broker to sell the property. The same day as the notification to Thompson's broker occurred, Thompson asked to speak with Jay Farquhar, who served as the Village mayor before Therese, about the continued harassment he experienced. The conversation never happened, as Farquhar was charged with aggravated battery that same day.

In July 2017, Haser again attempted to run Thompson off the road, prompting Thompson to call 911. Koerner refused to provide Thompson with a copy of the police report. On August

---

[5] SAFEbuilt describes itself as a "comprehensive community development services provider offering a wide range of support to jurisdictions, public agencies and developers," including "building department and professional services." SAFEbuilt Home Page, www.safebuilt.com (last visited May 26, 2026).

29, 2017, two Village employees arrived at Thompson's house concerning a call about Thompson burning things in his yard. Thompson had paid for permits to build a brick paver patio and fireplace, however.

In the summer of 2018, Thompson and KRT's mother had a custody dispute. The mother went to the Village police, asking for their help to remove KRT from Thompson's custody. On July 10, 2018, Koerner, Evie Lazzaroni, Little, and Martin removed KRT from Thompson's custody without a court order or DCFS investigation. Thompson then filed emergency motions with the court, and KRT returned to his custody approximately a month later. After the incident, Evie Lazzaroni, Martin, and Ludwig, and Koerner fabricated police reports related to their interactions with Thompson's lawyer surrounding the custody dispute.

On July 13, 2018, the Village police secretary sent an email to the entire Village police staff noting that Thompson came into the department to get twenty parking permits and was "extremely vague" about the type of party he was hosting, so she was providing everyone with a "heads up" and told them to "[s]tay safe." Doc. 186 ¶ 116. In March 2019, Erwin yelled to Thompson that he needed to move his campers from his driveway. The next day, the Village issued a citation to Thompson for the camper not being far enough into his driveway.

On July 2, 2019, Thompson noticed an African American woman crying in the street near an Amazon truck in a ditch in front of Haser's house. The woman told Thompson that Haser ran her off the road and said, "Black bi--- doesn't come back in this neighborhood or else." Doc. 186 ¶ 69. Thompson pulled the truck out of the ditch, but the police report, made by Anthony Lazzaroni, does not record Thompson's assistance in the matter or his speaking with the police about Haser doing similar things to him. In August 2019, David banged on Thompson's door loudly and, when Thompson opened it, asked him if he had left dog poop on the Lynches' back

7

door.  On May 7, 2021, Erwin and Haser sent an anonymous complaint using Haser's email address to the Illinois Attorney Registration and Disciplinary Commission, stating that Thompson, a neighbor, had been investigated for impersonating an attorney and is a convicted felon.  It noted that his car had magnetic signs advertising TLG, a legal group, and included a photo of the signage on his car and camper.  Thompson's son owns TLG, and Thompson placed the signage on his vehicle to promote his son's new law firm.

After experiencing continued harassment related to his RV, in March 2021, Thompson placed his RV in a storage facility, which cost him $264.32 a month.  In September 2021, Thompson took his RV out of storage and placed it in the rear of his house on the grass.  On March 16, 2022, Biris complained about Thompson's camper being on the grass in the rear of his house.  Thompson had observed many other residents in Monee, including the person who bought his investment property, with boats, campers, and trailers on their grass, however.  He therefore showed Biris the two campers on the grass at his neighbor's property and also informed Biris of eight other houses with campers, boats, and trailers parked in the grass on their properties.  Biris indicated that no one had called the Village to complain about these other properties.  Specifically, Thompson highlights that 5215 W. Main Street has a trailer in its driveway and 5203 W. Court Street, located 0.1 miles from the Village Hall and directly across from the Village employee parking lot, had a camper on grass in the front yard for over two years.  The owners of these properties had not received any warnings, fines, citations, or tickets before Thompson filed his lawsuit.  The Village asked the property owners at 5203 W. Court Street to relocate their RV four weeks after Thompson filed suit.[6]  Thompson also notes that an abandoned car with a flat tire was parked in the grass across the street from the Monee Police

---

[6] The owners sold the RV in 2024.

Department.  According to Thompson, none of the abandoned cars or trailers that violate the Village Code have received warnings, citations, or fines.

On May 25, 2022, Thompson solicited quotes to build a concrete pad at the rear of his property along with a new driveway and landscaping.  On June 1, 2022, Thompson retained the services of a subcontractor to help him excavate and pour concrete for the concrete pad. Thompson obtained the necessary permits from the Village.  On July 3, 2022, Thompson decided to complete a new driveway and undertake other projects as well.  On August 22, 2022, the Village started writing tickets for Thompson having a trailer on the grass, but Thompson had no other place to put his RV during construction.  Thompson demanded that Biris investigate the RVs in the grass at 6636 W. Maple Court, with Biris responding that if Thompson filed an official complaint he "might consider doing something."  Doc. 186 ¶ 87.

On March 15, 2023, Roberta walked to Thompson's garage door and asked him to do something about his LED lights because they shone through her front window at night.  On April 12, 2023, while Thompson had the garage doors open and a garden utility cart at the end of his driveway, Kos handed Thompson a code compliance notice that he had garbage or recycling cans in public view and had to resolve the issue before 8 a.m. the next day.  When Thompson questioned Kos about the warning, Kos responded that he did not see Thompson outside working in his yard when he wrote the warning.  Kos then drove away, and Thompson called the Village police to file a complaint about the harassment.  According to Thompson, many residents of his subdivision often have multiple garbage cans visible.  In fact, Thompson has provided photographic evidence of fifteen different houses in his subdivision on March 5, 2025 that had multiple garbage cans visible.  That same day, Thompson received an email from Williams reminding him of the requirement that all garbage containers be stored behind a privacy fence or

9

out of view from public areas and asking him to move his garbage can out of public view by 8 a.m. the following day.

On April 25, 2023, Roberta again came to Thompson's door to complain about his LED lights. Thompson called the Village police and asked them to tell Roberta to stop trespassing on his property. Ludwig responded by asking Thompson what could be done "to squash this." *Id.* ¶ 96. Thompson responded that the police should tell Roberta to move, to which Ludwig replied that "the Village will just keep giving [Thompson] tickets." *Id.* The house directly next to Erwin and Roberta also has LED lights about which Erwin and Roberta apparently have not complained.

After April 25, 2023, police and code enforcement officers started driving by Thompson's house more frequently and writing tickets to cars parked in front of the house. One ticket, written on April 26, 2023 at 1 a.m., carried a $75 fine. At the same time, police did not issue tickets to cars parked in front of the house next to Thompson's. On April 28, 2023, David drove his lawnmower to Thompson's mailbox and asked Thompson why he called the police on Roberta. David indicated that Thompson needed to be careful and watch himself "unless [he] want[s] more problems" because "this is our Town." *Id.* ¶ 98.

On July 19, 2023, Thompson began working on his car in his driveway. On July 21, 2023, Kos told Thompson that he needed to perform the repairs in his garage instead of outside. Kos wrote Thompson a code compliance notice for having an inoperable vehicle and required Thompson to resolve the issue before 8 a.m. on July 25, 2023. That same day, Thompson contacted the Village police to express his continued feelings of being targeted and harassed. He showed Crescenti around his property, pointing out his neighbor's camper on the grass and the dismantled vehicles at houses around him. Thompson also noted that his neighbor had a crashed

10

vehicle in their driveway for twenty-six months, and another house two minutes from the police station had a car on jacks in its driveway for thirteen months. Neither property owner received any warning, fines, citations, or tickets for these alleged infractions, but the police did ask the owner to move the crashed vehicle after Thompson filed his complaint in September 2023. As of June 3, 2024, Thompson's neighbors had a disabled vehicle junked for parts in their grass, but they had not received a ticket for it.

On August 25, 2023, at 12:49 a.m., Erwin and Roberta called the Village police to complain that Thompson was sitting in front of his pond. Police officers arrived at Thompson's house around 1:30 a.m. and shone their spotlights on Thompson and his house. After Thompson filed this lawsuit, on October 12, 2023, Officer Kos parked in front of Thompson's house for fourteen minutes and observed Thompson while he worked outside.

On June 6, 2024, Thompson opened his garage door at 10:37 a.m. to perform exterior maintenance on his property, only to have a code enforcement officer arrive fourteen minutes later. Later that day, Thompson walked out his front door to water his plants and feed his fish. A Village police car pulled up fifteen minutes later. Similarly, within fifteen minutes of starting landscaping projects, Thompson recalls a code enforcement officer arriving with alleged code violations.

On July 20, 2024, Thompson's neighbor, who is white, held an event with over forty cars but he did not have a permit as required when an event involves ten cars or more. He nonetheless did not receive any complaints, warnings, or citations. On July 25, 2024, Thompson received a warning to move his camper from the grass, and he did so the following day. After he sealcoated his driveway, he moved his camper closer to his home and placed orange cones in front of the driveway to protect the blacktop coating. Thompson received tickets while he

11

performed this annual maintenance on his driveway. But Therese did not receive a warning or ticket for parking her car on the grass in front of her house while she performed the same maintenance on her driveway.

On June 6, 2025, Thompson's minor child found several orange notices taped to the front door of their house. One notice concerned his garbage can being visible from the street. Another notice concerned a dryer on the curb, which Thompson had left for a scrap metal vendor to pick up that day. He received a warning about the dryer only twenty-three minutes after he had placed the dryer at the curb. Thompson's neighbor, Roger Sollie, testified that he had left a washer and dryer on the street for three days and never received a warning or a ticket. Erwin and Roberta had also placed a double-door cabinet on the street on a Thursday night and it remained there Friday morning when the Village waste management company indicated it could not take it. Thompson ultimately took the cabinet and broke it down that afternoon, but Erwin and Roberta never received a warning or ticket. Around this same time, Thompson had also purchased materials for a landscaping upgrade to his volleyball and basketball courts and playground. He estimated the project would take about three days. Thompson received a warning for having cars on the grass due to this landscaping upgrade. Other homeowners in his subdivision who have done projects on their property and parked their cars on the grass in the meantime did not receive warnings or fines.

On July 20, 2025, as Thompson sat outside his house feeding his fish, a marked Village police vehicle circled past Thompson's home rapidly. On July 22, 2025, a Village code enforcement officer came to a complete stop in front of Thompson's home for three minutes.

Thompson's house is on the last cul-de-sac in his subdivision, meaning that police and code enforcement officers had to go out of their way to find violations. He complains that eight

12

out of ten times when he left his house, code enforcement or police officers would drive by his property within fifteen minutes, reportedly due to the Neighbors having called to report his movements. At times, on his way to the local gas station, Thompson would pass Therese's house and observe Village police cars. Thompson would make a U-turn to return to his house, after which police would follow him and inform him of anonymous complaints they had received, such as having a trailer, ATV, or RV on the grass, visible garbage cans, loud music, or burning wood or paper.

According to discovery produced in this case, Thompson has received more than twice as many warnings, citations, tickets, and fines as any other property in his subdivision. As of the filing of the second amended complaint in December 2025, Thompson received over 140 verbal and written warnings, tickets, citations, and fines for ordinance violations. This includes over $15,000 in fines. Upon complaining to Village police officers about harassment, Thompson has received various responses. These include explanations that while the complaints are anonymous, he already knew who made them; that his "neighbors don't like [him] why do[esn't] [he] just pack up and go"; that he knew his "neighbors are going to run [him] out of the neighborhood"; and that he should "[j]ust try and comply." *Id.* ¶ 114.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to

13

the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**ANALYSIS**

**I.      Federal Claims**

**A.      Statute of Limitations for § 1983 Claims**

The Court previously dismissed with prejudice all of Thompson's federal claims based on events occurring before September 18, 2021 as barred by the statute of limitations. *See* Doc. 105 at 11–13. Nonetheless, Thompson has again included allegations of events dating back to 2007. The Court reiterates that while this information may be useful as background to any timely allegations, Thompson cannot base any federal claims on events that predated September 18, 2021, when he filed this case. As the Court previously stated, because each individual instance of which Thompson complains created a separate and distinct injury, the continuing violation doctrine does not apply. *See Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir. 2010) ("The continuing violation doctrine . . . does not apply to 'a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing.'" (quoting *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005))); *Chambers v. Vill. of Oak Park*, No. 22-cv-6008, 2024 WL 3292814, at *5 (N.D. Ill. July 3, 2024) (rejecting application of continuing violation doctrine to equal protection class-of-one claim); *Ghashiyah v. Jess*, No. 21-CV-1479, 2023 WL 5558825, at *4 (E.D. Wis. Aug. 29, 2023) ("Although there was a pattern of Defendants not allowing Plaintiff to use his legal name, Plaintiff cannot use an

14

independent predicate to 'act as a bootstrap to recover for injuries caused by earlier predicate acts that took place outside the limitations period.'" (quoting *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 802 (7th Cir. 2008)).

Thompson has also reasserted his federal claims on KRT's behalf, raising a Fourth Amendment unlawful removal and seizure of a minor child claim and a procedural due process claim concerning the 2018 custody dispute in which the Village police required Thompson to turn KRT over to her mother, with whom she stayed for approximately thirty days before returning to live with Thompson.[7]  The Village Individual Defendants argue the statute of limitations bars these claims as well.  Although this was implicit in its prior ruling, the Court now makes it explicit: Thompson and KRT cannot proceed on any claims related to the 2018 custody dispute given the Court's prior ruling on the statute of limitations.  Although the statute of limitations is an affirmative defense that Thompson and KRT need not anticipate in the second amended complaint to survive Defendants' motions to dismiss, that is not the case where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint reveals that an action is untimely under the governing statute of limitations." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *see also Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (considering statute of limitations defense on motion to dismiss where the complaint set forth the relevant dates in the complaint).  As with the other federal claims, a two-year statute of limitations applies to the claims related to the custody dispute.  *See Limestone*, 520 F.3d at 805.  Because the custody dispute involving KRT occurred in 2018, well over two years before Thompson filed this case on September 18, 2023, the federal

---

[7] The Court previously dismissed KRT's claims because Thompson could not represent KRT's interests while proceeding *pro se*.  Doc. 105 at 10–11.  Thompson has since obtained counsel, curing this previously identified defect with KRT's claims.

claims involving KRT cannot proceed. The Court dismisses the Fourth Amendment and procedural due process claims with prejudice.

### B. Personal Involvement of Certain Village Individual Defendants

Having narrowed Thompson's federal claims to conduct that occurred after September 18, 2021, the Court previously dismissed Thompson's federal claims against Koerner, Martin, and Evie Lazzaroni because Thompson did not include any allegations against them that accrued after that date. Doc. 105 at 13. As the Court stated, "to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act."). Personal liability exists where the conduct occurred at the defendant's direction or with his or her knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In other words, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

Thompson has again named Evie Lazzaroni, Martin, and Koerner in his second amended complaint. But he does not include any new allegations that Evie Lazzaroni or Martin had any specific involvement in conduct that occurred after September 18, 2021, and so the Court again dismisses Thompson's federal claims against them. As to Koerner, however, Thompson alleges that Koerner received a citizen complaint from a Black woman about Haser's behavior toward her in September 2024. This at least suggests that Koerner served as the Village police chief at the relevant time, although the Court questions the connection between Koerner's receipt of a

16

complaint about Haser from another individual and Thompson's federal claims. Nonetheless, Thompson also alleges that Koerner, as the police chief, acted in a racially discriminatory manner toward Thompson and directed Village police officers to target Thompson for unequal treatment. This suffices to suggest personal involvement. *See Gentry*, 65 F.3d at 561 (a supervisor may be held liable where they knew "about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye" to it).

Thompson has also added three new defendants: Bautista, Anthony Lazzaroni, and Little. Bautista allegedly serves as the Village Administrator and "appl[ied] discretionary decision making based on the color of [Thompson's] skin" and allowed the Village code enforcement and police officers to arbitrarily enforce the Village Code against Thompson. Doc. 186 ¶¶ 104–105. In light of these allegations of Bautista's involvement in a supervisory role, Thompson can proceed on his federal claims against Bautista. *See Gentry*, 65 F.3d at 561. But Little's only identified involvement occurred in 2018, falling outside the limitations period. Similarly, Anthony Lazzaroni's last identified interaction occurred in July 2019, which also falls outside the limitations period. The Court therefore dismisses Thompson's federal claims against Anthony Lazzaroni and Little for lack of personal involvement.

### C. Conspiracy Claims

Although the Court finds that Thompson has not sufficiently alleged the personal involvement of certain defendants for purposes of his § 1983 claims, he may alternatively proceed against them based on a conspiracy theory. To support conspiracy liability under § 1983, Thompson must allege "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

17

"[M]erely private conduct, no matter how discriminatory or wrongful," cannot lead to § 1983 liability. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted). "[A] private citizen can act under color of law if there is 'evidence of a *concerted effort* between a state actor and that individual.'" *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (citation omitted). To establish § 1983 liability for a private actor, "a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000) (citation omitted). "It is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (citation omitted). "[M]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Spiegel*, 916 F.3d at 616 (citation omitted). Instead, Thompson must provide "some factual allegations suggesting such a 'meeting of the minds.'" *Tarkowski*, 644 F.2d at 1206 (citation omitted). Circumstantial evidence can establish a conspiracy, but speculation cannot. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

Thompson also alleges a conspiracy claim against the Neighbors under § 1985(3), under which he must allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to a person or property or a deprivation of a right or privilege granted to U.S. citizens." *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002). Additionally, Thompson must

18

allege that the defendants acted out of some "class-based, invidiously discriminatory animus" and that the rights with which defendants interfered are protected against private encroachment. *Id.* "To plead the first element of a § 1985(3) conspiracy claim, a plaintiff must plausibly allege what is also required for § 1983 . . . conspiracy liability: 'an express or implied agreement among the defendants to deprive plaintiffs of their constitutional rights.'" *Coleman v. U.S. Marshals Serv.*, No. 25-CV-296, 2025 WL 2590387, at *3 (N.D. Ill. Sept. 8, 2025).

Thompson again alleges that Defendants agreed to force Thompson to move by any means necessary. The Court previously found that Thompson did not include sufficient allegations to suggest that the Neighbors entered into an agreement with the Village Individual Defendants to force Thompson to move from Monee. Doc. 105 at 15–16. Nothing in the second amended complaint warrants a different conclusion. Thompson's allegations of an agreement and joint activity again amount to allegations that the Neighbors live close to him and made phone calls that caused code or police officers to arrive at his house shortly after he left it. The Neighbors' "'mere act of furnishing information to law enforcement officers' does not constitute joint activity," however. *Spiegel*, 916 F.3d at 617 (quoting *Butler v. Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir. 1978)). The fact that the Neighbors and Village Individual Defendants referred to Thompson as "Kenny" similarly does not suggest an agreement to force him to move out of town. And while Erwin and Roberta had close connections to their daughter, who serves as the Village Mayor, this alone does not suggest an agreement, nor does it explain an agreement involving the Lynches as well. Because they consist merely of speculation, Thompson's conclusory allegations of a conspiracy as to the Neighbors do not suffice. *See* Doc. 105 at 15–16; *Thompson v. Vill. of Monee*, No. 12 C 5020, 2013 WL 3337801, at *7–8 (N.D. Ill. July 1, 2013) (dismissing conspiracy claim where Thompson did not include any "factual allegations of

19

any explicit meeting or directive between the Neighbors and the officers"). Therefore, Thompson cannot pursue any federal claims against the Neighbors and the Court dismisses Thompson's claims against the Neighbors in this case with prejudice.

As for the Village Individual Defendants, a pattern of harassment, coupled with allegations of an agreement and scheme, may suffice to state a conspiracy claim. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) ("If several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion. Geinosky's allegations of a conspiracy among the officers of Unit 253 to harass him by issuing bogus parking tickets go well beyond the required threshold."); *Thompson*, 2013 WL 3337801, at *8 (allowing conspiracy claim to proceed against officers based on a pattern of harassment by the various officers over a period of time, relying on *Geinosky*). The Court previously found that while the events that occurred within the limitations period may not be as egregious as those in *Geinosky*, the Court could hold individuals who had no involvement in the events within the limitations period liable for the actions of their co-conspirators that occurred during the limitations period as long as they did not withdraw from the conspiracy. Doc. 105 at 16–17 (citing *Geinosky*, 675 F.3d at 749–50). As with the first amended complaint, Thompson's second amended complaint does not sufficiently plead that all of the Village Individual Defendants continued to conspire to violate his constitutional rights during the limitations period given that Thompson does not provide any indication that Evie Lazzaroni, Anthony Lazzaroni, Martin, or Little remained employed by the Village during this time.[8] Therefore, the Court dismisses the federal claims against Evie

---

[8] The second amended complaint includes some indications that Haser left his position as Village Clerk during the limitations period. Even assuming that Haser left his position before the limitations period,

20

Lazzaroni, Anthony Lazzaroni, Martin, and Little with prejudice. Having resolved these questions, the Court turns to the sufficiency of Thompson's federal claims.

### D. Equal Protection Claim

To adequately plead a class-of-one equal protection claim, Thompson must "allege facts plausibly suggesting that [ ]he was 'intentionally treated differently from others similarly situated' and 'there is no rational basis for the difference in treatment.'" *Van Dyke v. Vill. of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020) (citation omitted). Because of its discretionary nature, selective or incomplete enforcement of the law does not, by itself, constitute a violation of the Fourteenth Amendment; in fact, such enforcement "is the norm in this country." *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985); *see also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604 (2008) ("[A]llowing an equal protection claim on the ground that a [speeding] ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action."); *Esmail v. Macrane*, 53 F.3d 176, 178–79 (7th Cir. 1995) (finding that selective prosecution in the form of a government's "fail[ure] to prosecute all known lawbreakers . . . has no standing in equal protection law," even though "it involves dramatically unequal legal treatment," with some people "being punished and others getting off scot-free"). Thus, "an exercise of prosecutorial discretion, unless based on some invidious discrimination, is not typically a basis for a class-of-one challenge." *Van Dyke*, 819 F. App'x at 432. In other words, Thompson can only state a claim based on selective enforcement if he alleges invidious discrimination—action that is "wholly arbitrary" and "inconsistent with the Fourteenth Amendment." *Frederickson v.*

---

Thompson's allegations suggest that he conspired with his wife and other Village employees throughout the limitations period, and so the Court allows Thompson to proceed with his conspiracy claims against Haser at this time.

*Landeros*, 943 F.3d 1054, 1060 (7th Cir. 2019) ("[W]e have recognized that a party may allege that this type of 'invidious' action—wholly arbitrary, inconsistent with the Fourteenth Amendment—is the only factor distinguishing the target from the rest of the population, and that such a showing suffices to prove the lack of a rational basis.").

The Court previously allowed Thompson to proceed with his equal protection claim. Doc. 105 at 18–20. In moving to dismiss the first amended complaint, Defendants did not argue that a rational basis existed for the actions of which Thompson complained, instead focusing on whether Thompson had shown an "extraordinary pattern of baseless tickets" and whether Defendants treated other similarly situated individuals differently. *See id.* But in response to Thompson's second amended complaint, the Village Individual Defendants now argue that Thompson has pleaded himself out of court by revealing a rational basis for their actions. *See Ind. Land Tr. #3082 v. Hammond Redevelopment Comm'n*, 107 F.4th 693, 698 (7th Cir. 2024) (affirming dismissal of class-of-one equal protection claim where the court did not need to "hypothesiz[e]" a rational basis because the plaintiffs "supplied it themselves," pleading themselves out of court).

Specifically, the Village Individual Defendants argue that Thompson has admitted in his second amended complaint that the conditions underlying the warnings, citations, and fines existed, meaning that the Village Individual Defendants had a rational basis for their actions: enforcing the Village Code. *See Murphy v. Vill. of Plainfield*, 918 F. Supp. 2d 753, 757–58, 762–63 (N.D. Ill. 2013) (finding that the defendant's enforcement of an ordinance against the plaintiffs but not others who were violating the ordinance passed the rational basis test because it "served a government interest by enforcing local law"). Thompson, however, argues that he faced a "sustained pattern of disproportionate enforcement and surveillance that escalated after

22

protected activity and diverged markedly from how similarly situated property owners were treated," Doc. 241 at 7, so the fact that he technically violated the Village Code does not preclude him from proceeding on his claims. But Seventh Circuit precedent counsels otherwise.

"All it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). As discussed above, "certain forms of state action—as with the approval process and code enforcement at issue here—'involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.'" *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (quoting *Engquist*, 553 U.S. at 603); *see also Van Dyke*, 819 F. App'x at 432 ("[E]nforcement of [the law] is a prosecutorial decision, which entails selectivity." (citations omitted)). Therefore, Thompson's acknowledgment that he violated the Village Code, even if he provides excuses for why he should have received leniency, supplies a rational basis for the Village Individual Defendants' conduct.

That is the end of the road for Thompson's class-of-one equal protection claim: "even assuming the [Village Individual Defendants] had an ulterior motive, the finding of a rational basis is 'the end of the matter—animus or no.'" *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 773 (7th Cir. 2021) (quoting *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014)). In other words, Thompson cannot save his claim with allegations of an improper motive and harassment campaigns. *See D.B.*, 725 F.3d at 686 ("[A] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity."). While the Court does not condone the Village Individual Defendants' behavior, it cannot provide Thompson with a remedy under the equal protection clause given that he has revealed a conceivable rational explanation for his receipt of

23

the warnings, tickets, and fines.  *See Storey v. City of Alton*, 710 F. App'x 706, 708 (7th Cir. 2018) (plaintiff's admission that he committed ordinance violations "demonstrates that the City had a rational basis for citing him").  As a result, this case differs from *Geinosky v. City of Chicago*, where the Seventh Circuit found a class-of-one equal protection claim could proceed because no "reasonable explanation" had been suggested for the plaintiff's receipt of twenty-four "bogus" parking tickets from several police officers within the same unit who were connected to his estranged wife.  675 F.3d at 745, 748.  Because Thompson cannot allege that the harassment he encountered "ha[d] no conceivable legitimate purpose" in light of his admissions of code violations, *id.* at 748, his class-of-one equal protection claim cannot proceed, *see, e.g.*, *Smith v. Wolf*, No. 13 cv 63, 2013 WL 3168753, at *4 (N.D. Ill. June 20, 2013) (dismissing class-of-one claim because plaintiff "alleged uneven law enforcement rather than 'class-of-one' discrimination").

### E.     First Amendment Retaliation Claim

To state a First Amendment retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action."  *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)).  The second element requires an objective inquiry, determining "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity."  *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (quoting *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020)).  "Whether retaliatory

24

conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, [the Court] can resolve the issue as a matter of law." *Douglas*, 964 F.3d at 647.

The Court previously allowed this claim to proceed, concluding that it could not determine whether Thompson suffered a deprivation that would deter future First Amendment activity at the motion to dismiss stage. Doc. 105 at 21–22; *see Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It is a question of fact whether [a campaign of harassment] reached the threshold of actionability under section 1983."); *Brewer v. Town of Eagle*, 663 F. Supp. 3d 909, 932–33 (E.D. Wis. 2023) (a reasonable jury could find defendants' conduct in signing off on a complaint against the plaintiffs, deciding whether to enforce ordinances against them, and pursuing code violations against them when they might not have otherwise done so sufficiently severe to meet the second element of a First Amendment retaliation claim). The Village Individual Defendants again challenge this element, arguing that because their issuance of warnings and tickets had a rational basis, Thompson cannot allege that he suffered a deprivation that would likely deter First Amendment activity. But the Village Individual Defendants provide no support for their conclusion that the existence of a rational basis for their actions defeats a First Amendment retaliation claim. True, a First Amendment retaliation claim may mirror an equal protection class-of-one claim so much that they "coalesce" and rise or "fall together." *Thayer v. Chiczewski*, 705 F.3d 237, 255 (7th Cir. 2012). But because the Village Individual Defendants have not pointed the Court to any caselaw supporting their position that Thompson cannot rebut the existence of a rational basis for purposes of a First Amendment retaliation claim, and the Court will not conduct research on its own when the parties are represented, the Court will allow Thompson to proceed on this claim. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and

25

construct legal arguments for parties, especially when they are represented by counsel."); *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived.").

### F. *Monell* Liability

Finally, the Court considers whether Thompson has sufficiently alleged a basis to hold the Village liable on his First Amendment retaliation claim. Although Thompson cannot hold the Village vicariously liable under § 1983 for the actions of its employees, *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015), he can attempt to hold the Village liable for its "own violations of the federal Constitution and laws," *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). To state a *Monell* claim, Thompson must allege: "(1) [he] was deprived of a constitutional right; (2) the deprivation can be traced 'to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault, i.e., deliberate indifference'; and (4) 'the municipal action was the moving force behind the federal-rights violation.'" *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023) (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021)). Thompson can show municipal action through allegations of (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

In the second amended complaint, Thompson alleges that Therese serves as a final policymaker, the Village has a widespread custom of racially motivated harassment, and the Village fails to adequately train its employees officers to prevent racial harassment and selective enforcement based on race. The Court considers each of these theories in turn.

### 1. Final Policymaker

"In order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (alteration in original) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)). Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority. *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). Courts look at "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Mitchell v. Vill. of Dixmoor*, No. 20 C 436, 2021 WL 3603625, at *5 (N.D. Ill. Aug. 13, 2021). And, importantly, "the question is whether the plaintiff has identified the decisionmaker 'responsible for establishing final policy with respect to the subject matter in question.'" *Snyder v. King*, 745 F.3d 242, 249 (7th Cir. 2014) (citation omitted) (finding local voter registration boards are not policymakers because they "simply do not make an independent policy judgment"); *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009) ("Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue[.]'" (citation omitted)).

The Court previously found that Thompson had only made conclusory assertions about Therese's policymaking authority. Doc. 105 at 24–25. Thompson has included additional allegations about her authority, alleging that she presides over all Village Board meetings, signs all Board meeting minutes, provides a Mayor's Report at Board meetings, introduces motions that the Board often approves without a veto, signs off on major financial decisions for the Village,[9] and has authority over hiring decisions. He also alleges that the Board has never rejected Therese's legislative proposals and rubberstamps her recommendations. None of these allegations suggest that Therese had final *policymaking* authority over the enforcement of the Village Code, however. And while Thompson again parrots allegations that another court found sufficient to state a *Monell* claim based on the alleged final policymaking authority of the mayor, *see Cozzi v. Vill. of Melrose Park*, 592 F. Supp. 3d 701, 714–16 (N.D. Ill. 2022), the Court has already rejected Thompson's attempt to rely on *Cozzi* to suggest that Therese had similar authority as the mayor in that case. Doc. 105 at 24–25; *see Reed v. Gallegos*, No. 23-CV-002247, 2024 WL 4826495, at *5 (N.D. Ill. Nov. 19, 2024) (plaintiff's "bare assertions" about the police superintendent's "implementation of a specific policy or practice that was directly traceable to Plaintiff's injuries" did not suffice to state a *Monell* claim); *Billups-Dryer v. City of Dolton*, No. 20 C 1597, 2022 WL 1693486, at *5–6 (N.D. Ill. May 26, 2022) ("Courts routinely require more of plaintiffs than conclusory allegations that a hypothetical decision-maker caused them harm. A degree of particularity is required, even at this stage of the litigation, to withstand a motion to dismiss." (collecting cases)). Thompson's additional allegation in his response about messages among code enforcement officers that the "Mayor is going to flip when she sees" a

---

[9] The example that Thompson uses to support this from the January 22, 2025 Board minutes indicates that the Board approved having the Mayor and Clerk sign certain plats of dedication. *See* Doc. 186 ¶ 179(D). Contrary to the inference Thompson draws from these meeting minutes, the meeting minutes suggest that Therese needed approval from the Board for financial decisions.

28

picture of Thompson's property, Doc. 220 at 4, does not change the calculus.[10]  While this may support Thompson's contentions that Therese had animosity toward him and that Village employees knew of that animosity and acted in an attempt to curry favor with Therese, action "in anticipation of mayoral reaction or approval," as Thompson puts it, *id.*, does not tend to suggest that Therese had final policymaking authority over enforcement decisions.

### 2. Custom or Practice

Thompson also alleges that the Village has a custom of racially motivated harassment. The Village argues that Thompson has not sufficiently alleged that the Village generally enforces the Village Code based on the race of the perpetrator and instead relies only on his own experience.  Although the Seventh Circuit has reminded courts not to apply a "heightened pleading standard" to *Monell* claims, *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (quoting *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)), Thompson's allegations nonetheless fall short of suggesting a widespread policy or practice.

While Thompson may rely on his own experiences at the pleading stage, *id.*, he must still include some allegations to allow the inference that the Village maintained a policy or practice of discrimination, as opposed to the inference that his injuries arose from a random event, *see Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (a *Monell* claim requires "a *widespread practice* that permeates a critical mass of an institutional body," not "individual misconduct");

---

[10] The Village argues that the Court should not consider this text message, which Thompson did not include in the second amended complaint but only references in his response brief.  The Court can, however, consider additional facts that a plaintiff includes in his response brief to the extent consistent with the allegations in the complaint.  *See Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 752–53 (7th Cir. 2001).  The Court fails to see any inconsistency between the text message and the facts in the second amended complaint, nor does it find that considering the text message prejudices the Village, particularly given that the Village had an opportunity to respond to the additional fact in its reply brief.

*Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." (citation omitted) (internal quotation marks omitted)). For example, in *White*, the plaintiff alleged that the defendant officer sought an arrest warrant, knowing he lacked probable cause, based upon conclusory allegations that the plaintiff had committed a criminal offense. 829 F.3d at 840–41. The plaintiff also attached a copy of the "standard complaint form" that did "not require specific factual support for an application for an arrest warrant." *Id.* at 841, 844. The Seventh Circuit found that the plaintiff's allegations of a widespread practice of requesting warrants based on conclusory allegations, "[t]ogether with the individual claim against [the officer] and the standard printed form," sufficed to state a claim. *Id.* at 844; *see also Mendez v. City of Chicago*, No. 1:18 C 6313, 2019 WL 4934698, at *3 (N.D. Ill. Oct. 7, 2019) (reference to Department of Justice report on Chicago Police Department's use of excessive force during foot chases supported *Monell* failure-to-train claim at the pleading stage); *Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018) (reference to two reports highlighting Chicago Police Department's use of excessive force similar to plaintiff's allegations suggested existence of widespread practice, allowing *Monell* claim to proceed).

Here, unlike in *White*, the second amended complaint includes no additional factual allegations to support Thompson's claim of a widespread custom or practice outside of his own experience. Instead, the second amended complaint suggests only that Village employees singled out Thompson for harassment, not that a widespread practice existed within the Village of race discrimination. *Cf. White v. Whitefish Bay Sch. Bd.*, No. 24-CV-1076, 2025 WL 1207112, at *13 (E.D. Wis. Apr. 25, 2025) (plaintiff stated *Monell* claim by alleging "multiple

30

incidents over several years in which administrators in the district allegedly treated Black students more harshly than white students and failed to investigate harassment complaints made by Black students while investigating harassment claims made by white students"). True, Thompson includes several examples of other individuals' interactions with Haser that suggest Haser acted in a racially discriminatory manner toward them, but these examples do not relate to code enforcement, nor is it clear that Haser had any involvement in code enforcement.[11] Therefore, the Court cannot conclude that Thompson has sufficiently pleaded a policy or practice of racial discrimination.[12]

### 3. Failure to Train

Finally, Thompson alleges that the Village has failed to train and supervise its employees with respect to equal protection, racial discrimination, and the limitations on using code enforcement and police powers to target individual residents. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To sufficiently assert a failure to train theory, Thompson must allege that the Village's "failure to train amounts to deliberate indifference to the rights of persons with whom the [Village employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Only where a municipality's failure to train its employees in a relevant

---

[11] Thompson attaches three affidavits to his response in which African American Monee residents indicate that they had code enforcement issues and received fines, which they believe were unfair. One of the individuals, Schvanda Nix, also suggests that she received tickets to keep her quiet about the Monee Building Services Supervisor verbally assaulting her children. The Village again asks the Court to disregard these new affidavits. The Court finds that, even taking them into consideration, they do not provide a sufficient basis to support the existence of a widespread custom of racial discrimination, particularly where they do not specify whether a basis existed for the fines the other residents received nor provide a basis to infer that the reason they received the fines had anything to do with their race.

[12] The Court notes that Thompson may have had more success alleging that the Village had an official policy of intimidation to support a First Amendment retaliation claim, *see Lozman v. Riviera Beach*, 585 U.S. 87, 99–100 (2018), but he has not pursued such a theory.

respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. Deliberate indifference exists where "the defendant (1) failed to provide adequate training in light of foreseeable consequences; or (2) failed to act in response to repeated complaints of constitutional violations by its officers." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 345 (7th Cir. 2018). While "failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable," for "a single violation [to] suffice," Thompson must also assert "a recurring, obvious risk." *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021).

"Although a municipality may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its officers to prevent the violation, there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Here, as the Village points out, Thompson admits that he committed the code violations for which he received warnings and tickets. But Thompson also raises a First Amendment retaliation claim, and the Court has found it inappropriate to dismiss that claim against the remaining Village Individual Defendants at this time. Given this and the fact that Thompson alleges that he repeatedly complained about the Village Individual Defendants' allegedly unconstitutional behavior towards him and the Village took no steps to address this behavior, with enforcement instead continuing or even increasing after Thompson filed this lawsuit, the Court will allow Thompson to proceed against the Village with respect to his First Amendment retaliation claim. *See Flores*, 997 F.3d at 733–34 (allegations of a city's failure to train sufficed at the pleading stage where the plaintiff alleged

32

that the city "knew that its officers routinely drove over 50 miles per hour, but it took no steps to prevent this behavior").

III.    **State Law Claims**

A.    **IIED**

To state an IIED claim, Thompson must allege that "(1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) defendants' conduct actually caused severe emotional distress." *Lifton v. Bd. of Educ.*, 416 F.3d 571, 579 (7th Cir. 2005) (quoting *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 935 (2004)). For conduct to rise to the level of extreme and outrageous, it "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 21 (1992)). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not suffice. *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). "Whether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745 (2000). Courts examine the "degree of power" the defendant held over the plaintiff; "whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge"; and "whether the defendant reasonably believed that his objective was legitimate." *Cairel v. Alderden*, 821 F.3d 823, 835–36 (7th Cir. 2016) (citation omitted) (describing Illinois law).

The Court previously allowed Thompson's IIED claim to proceed against the Village Individual Defendants but not the Neighbors. Doc. 105 at 25–28. The Court noted that the

33

Defendants did not argue that the statute of limitations limited the scope of the IIED claim. *Id.* at 26 n.8. The Village Individual Defendants now make that argument, contending that a one-year statute of limitations applies to Thompson's IIED claim because he seeks damages from local government employees.[13] 745 Ill. Comp. Stat. 10/8-101(a). But as the Court previously noted, an IIED claim may constitute a "continuing tort," meaning that the claim "accrues, and the statute of limitations begins to run, at the time the last injurious act occurs or the conduct is abated." *Feltmeier*, 207 Ill. 2d at 285. The Village Individual Defendants point out that at least one Illinois Appellate Court found that the continuing tort doctrine does not apply to an IIED claim where much of the alleged conduct occurred many years before and a large gap exists between those earlier events and the more recent, timely actions. *See S.E. v. BMO Harris Bank Nat'l Ass'n*, 2025 IL App (2d) 240311, ¶¶ 44–46. But the Court does not find it appropriate to cabin its consideration of events to conduct that occurred after September 18, 2022 here, where Thompson alleges that, at least since the dismissal of his prior case against the Village and related individuals in 2015, he has experienced an ongoing and consistent pattern of harassment.[14]

Given this rejection of the Village Individual Defendants' attempt to limit the scope of the conduct, the Court stands by its prior substantive analysis of the IIED claim. The Neighbors

---

[13] The Village Individual Defendants acknowledge in their reply that a two-year statute of limitations would apply to Haser's conduct as a private citizen. *See Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003).

[14] The Court does agree with the Village Individual Defendants that, for the IIED claim, Thompson cannot rely on events that occurred before May 12, 2010 based on judicial estoppel. *See Thompson v. Vill. of Monee*, No. 12 CV 5020, 2014 WL 4175915, at *5–6 (N.D. Ill. Aug. 22, 2014) (dismissing Thompson's claims with prejudice that were based on events occurring before he filed a bankruptcy petition on May 12, 2010). Although the Village Individual Defendants also ask the Court to find that Thompson cannot rely on conduct occurring before June 17, 2015, when his prior lawsuit ended, the Court does not find it appropriate to make such a factual determination on an affirmative defense at the motion to dismiss stage.

34

again argue that Thompson has not plausibly alleged extreme and outrageous conduct, and the Court agrees. Thompson has not included any additional factual allegations about the Neighbors' conduct in his second amended complaint that warrants a different conclusion. *See* Doc. 105 at 26–27; *see also Thompson*, 2013 WL 3337801, at \*23 (allegations that neighbors called the police and made false allegations about the plaintiffs to the police did not go "beyond all bounds of decency to constitute intentional infliction of emotional distress"); *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 437–38, 447–52 (2005) (allegations that the defendants conducted 24-hour surveillance of the plaintiffs' property, made "hundreds" of calls to the police that caused the police to issue ordinance violation notices, and caused other investigations into the plaintiffs' activities did not amount to extreme and outrageous conduct); *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 973 (1991) (allegedly false statements to the police about plaintiff harassing, assaulting, and verbally threatening a co-worker, while likely "creat[ing] some distress and embarrassment for plaintiff" and "subject[ing] plaintiff to some indignities," did not rise to the level required to state extreme and outrageous conduct); *cf. Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 245–47 (1990) (plaintiff's cumulative conduct towards defendant, which included threats to kill her, rape her, and file a lawsuit to take custody of her son away from her, offers of money for sex on numerous occasions, and the spreading false information about her and her new employer, could support a finding of outrageous conduct).

As for the Village Individual Defendants, they argue that conduct within the one-year limitations period does not meet the elements of an IIED claim, although they do not further expound on this argument. But because the Court rejects the underlying premise of this argument—that the conduct is limited to just the one-year period before the filing of the complaint—the Court need not address the elements further. Instead, the Court adopts its prior

analysis of the IIED claim, in which it concluded that Thompson sufficiently alleged extreme and outrageous conduct in the form of a pattern of harassment and abuse of power by the Village Individual Defendants.[15] *See McGrath*, 126 Ill. 2d at 86–87 ("The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment. Threats, for example, are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out then when made by someone in a comparatively weak position."); *Lynch v. Young*, No. 04 C 5136, 2005 WL 946881, at *4 (N.D. Ill. Mar. 9, 2005) ("Plaintiffs here allege a series of abuses of official power, threats, and slander by law enforcement officers and city officials, all orchestrated in an attempt to harass, intimidate, and frighten plaintiffs, their families, and their friends. . . . The court finds that the average community member would be profoundly troubled by plaintiffs' allegations, and that they are sufficiently 'extreme and outrageous.'"). Therefore, the Court will allow Thompson to proceed with his IIED claim against the Village Individual Defendants.

### C.     Civil Conspiracy

The analysis for Thompson's state law conspiracy claim largely mirrors that for the federal conspiracy claim. A civil conspiracy claim under Illinois law requires allegations of "(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the

---

[15] In their reply brief, the Village Individual Defendants argue that certain of them did not have any or only limited involvement in the alleged conduct and so cannot be held liable for IIED. Because they only raised this argument in reply, the Court does not consider it here. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

unlawful overt act." *Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, ¶ 20. The Court again adopts its conclusion with respect to the Neighbors, finding that Thompson has not sufficiently alleged that they entered into an agreement with the Village Individual Defendants or each other to force Thompson to move from Monee. But because the second amended complaint sufficiently suggests a basis to infer that the Village Individual Defendants all agreed to engage in actions to drive Thompson out of town, the Court finds that Thompson may proceed on his state law conspiracy claim against all of the Village Individual Defendants.[16]

### CONCLUSION

For the foregoing reasons, the Court grants the Neighbors' motion to dismiss [204], denies the Village's motion to dismiss [208], and grants in part and denies in part the Village Individual Defendants' motion to dismiss [217]. The Court dismisses all claims against Erwin Bogs, Roberta Bogs, David Lynch, and Judith Lynch with prejudice. The Court reiterates that it has dismissed with prejudice Thompson's federal claims based on events occurring before September 18, 2021. The Court dismisses the equal protection claim (Count I), Fourth Amendment claim (Count VI), and procedural due process claim (Count VII) with prejudice and terminates KRT as a Plaintiff. The Court dismisses all federal claims against Evie Lazzaroni, Anthony Lazzaroni, William Little, and Jamal Martin with prejudice.

Dated: May 28, 2026

_____
SARA L. ELLIS
United States District Judge

---

[16] The Village does not include any argument with respect to the indemnification claim, despite requesting that the Court dismiss all claims against it. For purposes of completeness, the Court notes that it does not find it appropriate to dismiss the indemnification claim because it has found that Thompson may proceed against at least some of the Village Individual Defendants on some of his claims.